UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CINDY M. MARTINEZ-VALERIO,
WILLIAM A. VALERIO,
        Plaintiffs,

V.

BAYSTATE MEDICAL CENTER CO.,
GLENN MARKENSON, MD,
INGRID DUNN, MD,
ALBERT HSU, MD,
        Defendants.

FILED

U.S. DISTRICT COURT

CIVIL ACTION

NO. 09-30226-MAP

## AMENDED COMPLAINT

### PARTIES

1. The plaintiffs are residents of Hampden County, Springfield, Massachusetts, and are citizens of the United States.

2. The defendant, Baystate Medical Center Co., reside in 759 Chestnut Street, Springfield, Massachusetts 01199, Hampden County, and is a citizen of the United States.

3. The defendant, Glenn Markenson, MD, reside in 759 Chestnut Street (Baystate Medical), Springfield, Massachusetts 01199, Hampden County, and is a citizen of the United States.

4. The defendant, Ingrid Dunn, MD, reside in 759 Chestnut Street (Baystate Medical), Springfield, Massachusetts 01199, Hampden County, and is a citizen of the United States.

5. The defendant, Albert Hsu, MD, reside in 759 Chestnut Street (Baystate Medical), Springfield, Massachusetts 01199, Hampden County, and is a citizen of the United States.

### JURISDICTION

6. This court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

FACTS

7. On March 2, 2008, plaintiff, Cindy M. Martinez-Valerio, was experiencing repeated cramps (sharp pains) in her lower stomach. Being that it was her first long term pregnancy she felt it was common (maybe that her uterus was stretching due to the baby being active in her stomach).

8. Nevertheless, the plaintiff phoned her doctor, Dr. Devon Foulks, and at the time he was not on call. Instead, Dr. Denham called plaintiff back to inquire about her emergency call. Plaintiff explained her repeated cramping in her lower stomach area. Dr. Denham instructed plaintiff to relax and if the cramping continues to stop by the hospital.

9. At approximately 7:00pm plaintiff's husband and father of the unborn, William A. Valerio, arrived home from New York City. She explained to her husband (also plaintiff herein) the consistant sharp pain she was experiencing the entire day, even while resting. Out of serious concern, the husband directed for them to go to the hospital for safety measures.

10. Plaintiffs arrived at the Baystate Medical Center at approximately 8:00pm. Once inside, plaintiff was immediately brought to the examining room where the midwife did numerous examinations. The midwife quickly realized that plaintiff had dialated 4 centimeters and a small portion of the membrane was bulging out, which was not normal in a regular pregnancy and a serious risk. Immediately, the midwife contacted the doctor on call, Dr. Denham. Said doctor ordered for plaintiff to be admitted at once. Plaintiff at that time became very afraid and disturbed about the hazardous matter that has confronted her and her unborn son, Anthony William Valerio.

11. Once in room, plaintiff was given a ultrasound and her son's heartbeat was checked. The son's appearance and heartbeat was healthy and strong. At this time, both plaintiffs were uneducated and uninform of what actually was going on. The nurses layed plaintiff in bed in a upside down degree position to have gravity pull back the membrane that was bulging out of the cervix. The

reason for this method was to be able to stitch plaintiff's cervix shut until further notice. Plaintiffs then learn what the problem was. Plaintiff's cervix had a weak area where the membrane was able to penetrate through causing a risk. The doctors explained that said problem exist in many pregnancy and the procedure of laying her a certain way was common. The doctors hopes were to be able to stitch the weak cervix area keeping the membrane in place to hold the child until time of birth.

12. Plaintiff was instructed that she can not get up for nothing whatsoever. Plaintiff's husband was by her side at all times. Plaintiff insisted that she would stay in bed in the down right position for months until her unborn is born if need be. Plaintiff's husband and nurses placed bed pans underneath her for bathroom use purposes since she was not allow to move. Both plaintiffs prayed and fell asleep in the hospital.

13. The following morning, March 3, 2008, Dr. Ingrid Dunn came in and took some medical history of plaintiff. Dr. Dunn went further to explain the possibilities of the pregnancy. One of the possibilities is premature birth. Also, that with the baby coming out so early in the stages of pregnancy (20 weeks) the chances of the baby living was very poor since the baby's lungs were not fully develope. Dr. Dunn predicted the baby would only live for several hours after birth. At this time, plaintiff became very depress and weeping. The plaintiffs then asked if there were any medications that could stop the contractions; also, if plaintiff could receive some type of steroids to help develop plaintiff's baby's lungs faster and/or incubate the baby for survival (Plaintiff was determine to do what it took to bring a future to her first and only child). Dr. Dunn then informed plaintiffs that she would pass along the questions to Dr. Glenn Markenson so they could come up with a plan. A few moments later, Dr. Foulks (Plaintiff's primary doctor) entered the room and tested some fluid that was retrieved from plaintiff's vagina and the test

turned out negative for cervical fluid, which was a good sign. Dr. Foulks spoke briefly with plaintiffs and explained that since her pregnancy was considered High Risk she will be dealing with doctors that specialize in high risk pregnancy instead of him. Periodically, Dr. Foulks visited plaintiff throughout her stay in the hospital.

14. Several hours later, Dr. Dunn appeared with Dr. Markenson. A brief introduction was done. Said doctors went straight to the examination of plaintiff. The doctors noted that the membrane was bulging out more and that there were more visible fluid leaking out of the bulge. The doctors determine that at this stage a cerclodge on plaintiff's cervix was out of the question. Plaintiff became extremely depress and weeped profusely. Plaintiff hugged her husband for comfort, reassurance, and strength. Plaintiff begged the doctors that she wanted to save her baby's life. The doctors' response was that the baby was to underdeveloped and that there was no hope of survival. They also went on to state that the baby's life expectancy was several hours to 2 days the most (after birth). Dr. Foulks also confirmed the 2 days time period.

15. Plaintiffs determination not to allow that to be a true fact demanded medication to stop the contractions, but Dr. Markenson decline stating it would not make a difference. Plaintiff responded by stating that to him (Dr. Markenson) it would not make a difference since it was not his child's life on the line. As a first time mother, just trying to do her best to save her child's life would be able to rest better in her heart than not trying at all. The conversation with the doctors ended and they stepped out the room. Plaintiff's husband sat down and opened his labtop and got online to research premature birth survival like his unborn child. Shockingly, they found several similar articles of successful premature survival babies. As plaintiffs confidence and hope grew stronger they could not wait to show their research to the doctors.

16. Throughout the day nurses continuously examined plaintiff for fever and infections. Also, checking on the baby's heart rate, which always turned out in great health and strong heartbeat. Plaintiffs always insisted in hearing the baby's heartbeat.

17. Shortly after, Dr. Dunn and Dr. Markenson appeared in the room. Plaintiff quickly brought to the doctors' attention the research they had found online, via the internet, on successful premature baby survivals. Plaintiffs pointed out babies underdeveloped, like their child, and survived. Plaintiffs showed the doctors the internet articles and the doctors' replied in the negative stating the articles and stories were fake. Plaintiffs asked for them to do their own independent research on it to verify the accuracy of these articles and stories, but to no avail. The doctors did not bother to take further steps and again left plaintiffs hopeless.

18. What Dr. Markenson, Dr. Dunn, and Dr. Albert Hsu suggested was for plaintiff to take a medication(s) to help induce plaintiff's labor. Plaintiff declined and stated that she will hold her child for as long as she can because every new day counts towards her child's survival.

19. Later on that day, several family members and friends visited plaintiff. The visitors were her mother (Elsi Sepulveda), sister (Josephine Sepulveda), aunt (Sonia Martinez), friends (Maria Colon & Jose Vargas), and Cousin (Daisy Arroyo). They were all there for support and comfort. At all times, plaintiff remained in bed. Family and friends held several prayers for plaintiffs and the healthy birth of their child. Periodically, the doctors visited that night.

20. The following morning, March 4, 2008, plaintiff woke up with cramping and was medicated for it by nurses. Plaintiffs requested to hear the baby's heartbeat. The heartbeat was healthy and strong; plus, plaintiff's vital signs were good. The doctors periodically checked on plaintiff. Throughout the afternoon and evening plaintiff was experiencing consistant cramping. The same family and friends visited that evening in support and comfort.

21. During the evening hours, plaintiff felt something burst inside her vagina.

Everyone realize that her membrane had rupture. Plaintiff became very nervous and started weeping, explaining to her husband she did not want to give birth yet. The nurses informed the doctors, inwhich they came some time later. Once the doctors appeared they did an ultrasound and determine the baby was still in good health, with a strong heartbeat, and positioned good. The doctors informed plaintiff that she has no choice now and birth will be coming soon. The doctors then exited from the room. Plaintiff's husband, family, and friends try to comfort plaintiff, but she was extremely worried about her baby. Everyone in the room resume a prayer session. Plaintiff started experiencing tremendous cramping. Within 30-45 minutes, DR. Markenson examine plaintiff and stated that he felt the baby's head and that it was time to give birth. The doctors and nurses rushed to get ready, while the plaintiff's husband, family, and friends stood in the room holding plaintiff. Husband was holding plaintiff's right hand, while plaintiff's long time friend was holding left hand. Plaintiff's mother was holding left leg, while sister was holding right leg.

22. Dr. Markenson got in position and started instructing plaintiff to push. Plaintiff started pushing when Dr. Markenson realize the baby's feet were coming out first and he brought this to the nurse and doctor's attention that the baby was breech, meaning that the legs were coming out first. Plaintiffs, family, and friends started telling Dr. Markenson that he stated he felt the baby's head and how could it be possible that the feet would come out first. The rest of the baby's body was pushed out, but the head remain trapped in the cervix. Everyone, in the room, became horrified when they seen the baby's body moving and they became very nervous and started shouting to take the baby's head out of the cervix because the baby was suffocating. Plaintiff repeatedly and forcefully continue pushing, but the head would not be release from the cervix. Dr. Markenson applied several substances around the vagina to help remove the baby's head, but to no avail.

23. Everyone in the room were in tears because the baby's body no longer was moving. The doctor determine that the baby had died. Plaintiff became extremely hysterical and needed to be medicated. Plaintiff's mother also collapsed in witnessing the condition of her grandson. The plaintiff's mother had to be rushed out the room and treated. The baby's head continued to stay stuck inside the cervix. Dr. Markenson had put a small sheet over the remaining body outside the vagina, covering the vagina as well.

24. Plaintiff continued weeping over the realization that her baby's head was still stuck in her vagina and he died of suffocation. She also deeply expressed on why the doctors did not tell her the baby was breech, this way she could of prevented his suffocation by way of c-section giving her son a few moments of life and a possibility of miracle happening for the son to live on. In approx. 20 minutes, the doctors enter the room and Dr. Markenson then attempted to remove the baby's head from the cervix. He instructed for plaintiff to push. Plaintiff pushed and finally the head was release. At this point, everyone is emotionally sad and disturbed. The baby was wrapped up and handed to plaintiffs.

25. Everyone was looking at the lifeless baby. The baby had all his fingers, toes, limbs and so on. The baby was healthy with normal features. Everyone was wondering why the child could not have survive with proper medical care. The family took pictures of the baby. Then, the nurse did some exams of the baby and took photos as well. Several minutes later the baby was brought back to the plaintiffs with some miniature baby clothes. Later that night, plaintiff needed rest and the nurse took the baby to the morgue.

26. The following morning, March 5, 2008, plaintiff woke up requesting to see the baby, inwhich she did with husband and one family member. Plaintiff continued her weeping and grief. Shortly there after, Dr. Markenson visited plaintiff, where he was bombarded with lots of questions and concerns. Plaintiff explained to Dr. Markenson why did he state he felt the baby's head and then realized that the baby's feet (breeched) were coming out. He replied that maybe in the course

of him preparing for birth delivery the baby could had did a 360 degree body movement (he prepared himself no longer than 3 minutes). Then, plaintiff stated that as him being a doctor he knew that a breech birth was unsafe for baby and why she did not get another alternative this way the baby could of came out alive. He replied that "the baby was not going to live anyway, so why go through having a c-section and scaring your body." Plaintiff started crying and said that she would not have cared, but would of loved to hold her child while still alive for the several hours or days God would of gave him to live instead of the horrible experience and life time memories of her only child's lifeless body partially tangling from her vagina. Dr. Markenson expressed his condolences and told plaintiff that there was nothing that could be done to bring her son back and that she has to focus on getting better and preparing for her future pregnancy. Dr. Markenson repeatedly explained to plaintiff not to think it was her fault and not to blame herself because it was not her fault.

27. Plaintiff was released from the hospital on March 6, 2008, and the funeral preparation for plaintiffs' son, Anthony William Valerio, commenced.

These unfortunate events are what prompt this civil action against the defendants herein, for negligence, the wrongful death of plaintiffs' son, and emotional distress. Plaintiffs' are seeking damages from Baystate Medical Center for $15,000,000 and each individual doctor for $5,000,000 each. Along with condemning said doctors from performing practices that allows them to determine the life spand of someones child, without giving the child an apportunity to live or the parents the rightful decision to say yes or no. Also, to be properly equip when dealing with High Risk Pregnancies at the time of birth.

Plaintiffs demand a trial by jury and reserve their rights to submit additional defendants in the future process of this civil action and present exhibits of affidavits, photos, and documents pertaining to the action herein.

WHEREFORE, the plaintiffs demand, judgment against the defendants for damages and such other relief as this Court deems just.

Dated: *1-8-2010*

*Cindy M. Martinez-Valerio*
Cindy M. Martinez-Valerio
231 Louis Road
Springfield, MA 01118
(413) 209-6828
william.valerio@gmail.com